

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-09-00069-CV
_____

SCOTT D. MARTIN, Appellant

V.

RUBEN S. MARTIN, III, Appellee

On Appeal from the 188th Judicial District Court
Gregg County, Texas
Trial Court No. 2008-961-A

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

## I. FACTS AND PROCEDURAL POSTURE

In the intervening years since R. S. Martin, Jr., founded the company which eventually became Martin Resource Management Company (MRMC) in 1951, it experienced substantial growth. In its current situation, MRMC is a privately held company, which is also general partner of Martin Midstream Limited Partners, a publicly-traded company, valued in the hundreds of millions of dollars. It had been successfully jointly managed for some twenty years by Ruben S. Martin, III, and Scott D. Martin, sons of the founders (who owned or controlled all of the voting shares and both of whom were on the five-member board of directors) in an informal, collaborative relationship.[1] Formal shareholder and board meetings were infrequent and they regularly conducted votes through unanimous written consents.

Basically, an internecine power struggle over the control of MRMC arose between the brothers. Although the nature of the brothers' dispute is complicated, essentially Ruben contended that Scott was trying to take control of the company, while Scott took the position that it was Ruben's goal to "freeze" Scott out from corporate management. Beginning in 2006, the brothers' relationship began to deteriorate regarding the general direction of the company and their collegial

---

[1] Ruben was President, Chief Executive Officer, and Chairman of the Board of MRMC, an MRMC shareholder, and the trustee of the R. S. Martin's Children Trust No. 1 (Angela's Trust). Scott was Executive Vice President of MRMC, a member of the Board of Directors, an MRMC shareholder, and the trustee of the Ruben S. Martin, III, Dynasty Trust (Dynasty Trust). So long as Ruben was trustee of Angela's Trust and could control the votes of those shares, he had a slight voting advantage over Scott. However, the time for the termination of the trust was fast approaching and the brothers' mother had the ability to remove Ruben as trustee and name another person in his stead.

2

relationship was finally fractured in 2007 when Ruben decided that MRMC should seek to acquire a California refinery, while Scott opposed the move. This course of events led Scott to attempt to stop the purchase by formalizing MRMC's corporate decision-making process, which would impose checks on any type of unilateral control of the company by Ruben. Meanwhile, control of the board of directors remained in flux.

In an effort to settle their dispute over corporate control, Ruben and Scott met together and hammered out an agreement, which was monumentalized in a nineteen-paragraph document captioned "Settlement Agreement" drafted by Scott's attorney and signed on January 29, 2008.[2]

---

[2]The terms of the "Settlement Agreement" are summarized as follows:

Paragraph one: "Scott and Ruben will negotiate a shareholder agreement . . . ."

Paragraph two: "The parties shall work together to better organize the use of MRMC airplanes."

Paragraph three: "Scott may elect to sell any Colorado house and the proceeds shall be split according to ownership in such house."

Paragraph four: "Scott and Ruben shall be permitted to invite anyone to the MRMC Board meetings."

Paragraph five: "Upon completion of all of the obligations under this Settlement Agreement (the "Completion Date"), Wes Skelton shall resign as a co-trustee of the ESOP and Ruben and Scott shall remain as the sole co-trustees."

Paragraph six: "Upon the Completion Date, Scott shall resign from all trustee positions relating to any trust of Ruben's and a successor trustee shall be appointed at Ruben's discretion."

Paragraph seven: "On or before the Completion Date, Scott and Ruben shall each be given Employment Agreements with equal compensation and severance packages."

Paragraph eight: "Upon the Completion Date, Scott, Ruben and the officers and directors of MRMC shall execute mutual releases from any and all claims related to the issues subject to this Agreement."

Paragraph nine: "Upon the Completion Date, Ruben will transfer one share of common stock of MRMC to Scott."

Among other things, the agreement required the brothers to negotiate a shareholder agreement in good faith for sixty days (later extended by agreement to ninety days) and that upon completion of "all of the obligations under this Settlement Agreement" (defined as the "Completion Date"), certain other obligations would arise. Although the parties negotiated, they were unable to agree on the terms of a shareholder agreement and none of the remaining terms have been fulfilled.

Although he acknowledged the failure to arrive at an agreement concerning the content of a shareholders' agreement, Scott characterized Ruben's failure to perform the other obligations set

---

Paragraph ten: "Scott and Ruben will be the MRMC representatives appointed to the Arcadia joint venture board of directors."

Paragraph eleven: "Upon the Completion Date, Don Neumeyer and Wes Skelton will resign from the MRMC Board. Ruben and Scott will each have the right to appoint 1 additional Board member . . . . This shall be accomplished through a Unanimous Consent of Shareholders."

Paragraph twelve: "On the Effective Date, Ruben and Scott shall be appointed as co-investment trustee's [sic] of Angela's Trust."

Paragraph thirteen: "Upon the Completion Date, Ruben and Scott will each receive equal unsecured loans of up to $2,000,000 from MRMC, subject to Amegy approval on all of the terms and conditions of such loan."

Paragraph fourteen: "Upon the Completion Date, Scott, Ruben and Margaret Martin will be reimbursed by MRMC for all legal, consulting and other related expenses incurred in connection with the negotiation of the issues that are the subject of this Settlement Agreement."

Paragraph fifteen: "Upon the Completion Date, any and all outstanding stock options in MRMC shall be converted to non-voting shares upon exercise."

Paragraph sixteen: "There will be no shareholder votes except by unanimous consent until the Completion Date."

Paragraph seventeen: "Board action for MRMC will only be taken through unanimous consent until the Completion Date."

Paragraph eighteen: "Scott and Ruben will use their good faith efforts to work through counsel to document the agreements contained herein within sixty (60) days of the Effective Date."

Paragraph nineteen: "Angela will become employed by MRMC (at a location of her choosing), if she wishes."

4

forth in the agreement as a breach of contract. Scott brought suit to enforce the agreement, seeking specific performance and damages.[3] After a ten-day trial, the trial court submitted the case to the jury on the issues of breach and damages.[4] In doing so, the trial court impliedly found the agreement was an enforceable contract. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex. 1992); *Burnett v. Motyka*, 610 S.W.2d 735, 736 (Tex. 1980) (per curiam) (conclusions of law that are necessary, but not made, are deemed in support of judgment). The jury found Ruben breached the agreement and awarded Scott $3.2 million in damages and attorney's fees of $1.5 million. The judgment awarded Scott $3.2 million in accord with the jury verdict, included provisions requiring specific performance by Ruben of certain portions of the settlement agreement, and awarded $13,533.85 in costs to Scott. Ruben filed a motion for judgment notwithstanding the verdict and alternatively a motion for new trial, contending Scott was not entitled to judgment because the settlement agreement was unenforceable as a matter of law. That motion was overruled by operation of law.

---

[3]Scott maintains that because April 30, 2008, marked the end of the ninety-day negotiation period under the agreement, this was the date upon which all obligations under the agreement were to be fulfilled, i.e., the completion date. In his third amended original petition, Scott alleged that "Ruben has failed and refused to perform the obligations and undertakings required of him under the terms of the Settlement Agreement."

[4]The jury was also asked to determine whether Ruben and Scott were ultimately able to vote 100% of the voting shares of MRMC on the date of the agreement, whether Ruben and Scott were ultimately able to vote 67% of the voting shares on the date of the agreement, and whether by virtue of their shared voting power on the date of the agreement, Ruben and Scott were able to select and remove officers and directors of MRMC as well as the trustees for the Martin Resource Management Employee Stock Ownership Trust. The jury's positive response to these issues, as well as to the monetary damage question, is not in dispute.

5

In the race to appeal, Scott prevailed. In his sole point of error, Scott claims that he was entitled to recover $16,028.15 in costs, rather than the $13,533.85 awarded in the judgment, alleging that the trial court had acted arbitrarily, picking a number between the cost figure proved up by Scott and the number argued for by Ruben. Ruben filed a cross-appeal. In his reply brief, Ruben streamlined his issues and argument.[5] While his principal brief presented four issues, Ruben's basic issues, as joined by Scott on cross-appeal, are whether the January 29, 2008, settlement agreement is legally enforceable, and if so, whether Scott was entitled to an award of both money damages and specific performance for breach of the agreement. Because the settlement agreement is not enforceable as a matter of law, we reverse the judgment of the trial court and render judgment for Ruben.

## II.    ANALYSIS

Because resolution of Ruben's issues is determinative of Scott's point of error regarding the award of court costs, the issues raised by Ruben will be considered first.

In his first issue on cross-appeal, Ruben contends the settlement agreement is an unenforceable agreement to agree. Scott contends that this issue (not having been submitted to the jury) was abandoned and, thus, waived on appeal. We first address the issue of whether the agreement's enforceability was properly preserved and then discuss the merits of the issue.

---

[5]In his sur-reply brief, Scott contends Ruben improperly presented new issues on reply, in violation of Rules 38.1(f) and 38.3 of the Texas Rules of Appellate Procedure. TEX. R. APP. P. 38.1(f) ("The [initial] brief must state concisely all issues or points presented for review."); TEX. R. APP. P. 38.3 (reply brief should address matters raised in appellee's brief). Because Ruben fully briefed the issues regarding the agreement's legal enforceability and the propriety of the award of specific performance in addition to monetary damages, these issues are squarely before this Court.

6

## A. The Enforceability Issue Was Preserved

The central issue raised in this appeal is whether the parties' January 29, 2008, settlement agreement is an unenforceable agreement to agree. Scott contends that Ruben abandoned the contract formation issue by not submitting a question to the jury on this issue and in failing to object to the absence of such a question. This contention is based on Ruben's concession that he assented to the settlement agreement individually, but his assent to its terms was not in a representative capacity. On appeal, Ruben places more emphasis on the enforceability of the settlement agreement than at the trial level and relies less on the issue of the capacity under which he was operating at the time he signed the settlement agreement. Because he raised this issue in his motion for directed verdict and in his motion for judgment notwithstanding the verdict, or in the alternative, motion for new trial, Ruben contends that the issue of the contract's legal enforceability has successfully been preserved. We agree.

Black's Law Dictionary defines a "contract" as "[a]n agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law." BLACK'S LAW DICTIONARY 365 (9th ed. 2009). According to the Restatement of Contracts, the terms "agreement" and "contract" are not synonymous; "agreement" refers to a "manifestation of mutual assent on the part of two or more persons," whereas the term "contract" refers to "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes a duty." RESTATEMENT (SECOND) OF CONTRACTS §§ 1, 3 (1981); *see, e.g.*,

7

*Wiley v. Bertelsen*, 770 S.W.2d 878, 882 (Tex. App.—Texarkana 1989, no writ) (noting that the term "agreement" is more broad than the term "contract" and that it is possible for parties to enter into an agreement but still not have a contract). Although it is possible to enter into an agreement without forming a contract, the converse is not true.

Texas Pattern Jury Charge 101.1 sets forth the basic question regarding the existence of a contract. TEXAS PATTERN JURY CHARGES, BUSINESS, CONSUMER, INSURANCE & EMPLOYMENT, PJC 101.1 (2008). The commentary to this basic question of the existence of a contract states that 101.1 "submits the issue of the existence of an agreement. It should be used if there is a dispute about the existence of an agreement or its terms and a specific factual finding is necessary to determine whether the agreement constitutes a legally binding contract." *Id.* Rather than contending that a fact issue (which would require resolution by a jury) existed with respect to whether the contract was legally binding, Ruben maintained that the contract was not enforceable as a matter of law.

The failure to object to the omission of a question on contract formation, when taking the position that no contract exists in the first instance, is inconsistent with a waiver of that position. Ruben's concession that a fact issue did not exist on the intent to agree does not, however, resolve the issue of whether the contract is legally enforceable. In essence, Ruben complained that there was no evidence to warrant the submission of a question of contract formation to the jury because, as a matter of law, the contract was unenforceable. The question of whether an agreement is an

8

unenforceable agreement to agree is a question of law, not a question for the jury. *See Mickens v. Longhorn DFW Moving, Inc*., 264 S.W.3d 875, 880 (Tex. App.—Dallas 2008, pet. denied) ("Whether a contract is legally enforceable is a question of law for the court—not a fact issue for the jury."); *Meru v. Huerta*, 136 S.W.3d 383, 390 (Tex. App.—Corpus Christi 2004, no pet.) ("[W]hether a particular agreement is an enforceable contract is generally a question of law.").

Moreover, Ruben properly preserved the issue of whether the contract was legally enforceable as a matter of law. To preserve an issue of law, the appellant must raise the issue through one of the following: (1) a motion for directed verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection to the submission of the question to the jury; (4) a motion to disregard the jury's answer to a vital fact question; or (5) a motion for new trial. *See Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex. 1991); *United Parcel Serv., Inc. v. Tasdemiroglu*, 25 S.W.3d 914, 916 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). Ruben filed a motion for directed verdict on the issue of whether the contract was legally enforceable based on its status as an executory contract both at the conclusion of the plaintiff's case-in-chief and at the conclusion of the evidence. On each occasion, the motion was overruled. In addition, Ruben filed a motion for judgment notwithstanding the verdict and, alternatively, motion for new trial relying on this issue. This motion was overruled by operation of law.

Because Ruben raised this issue of law by filing the appropriate motions, the issue of the agreement's enforceability was properly preserved.

9

**B. The Settlement Agreement Is Unenforceable as a Matter of Law**

The primary issue in this case is whether the language expressly set forth in the agreement was sufficiently definite to be enforceable against Ruben. Whether a particular agreement is an enforceable contract is a question of law reviewed de novo. *Perry Homes v. Cull*, 258 S.W.3d 580, 598 (Tex. 2008); *Elijah Ragira/VIP Lodging Group, Inc. v. VIP Lodging Group, Inc.*, 301 S.W.3d 747, 754 (Tex. App.—El Paso 2009, pet. denied). On appellate review, we are not required to give any particular deference to the trial court's legal conclusion that the contract was legally enforceable. *See Cap Rock Elec. Co-op., Inc. v. Tex. Utils. Elec. Co.*, 874 S.W.2d 92, 99 (Tex. App.—El Paso 1994, no pet.). Rather, we are required to independently evaluate the trial court's legal determination. *Id.* Legal conclusions of a trial court are to be reversed only when they are erroneous as a matter of law. *America's Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 622 (Tex. App.—San Antonio 1996, writ denied).

Even though Ruben acknowledged (with few qualifications) his assent to every term of the settlement agreement, he maintains that by its express terms, the agreement is not a final, enforceable contract; he maintains that it was, rather, a mere listing of areas the two brothers planned to address over the next few months in an attempt to resolve their disputes. The first

paragraph of the agreement calls for the negotiation of a shareholder agreement binding on all MRMC shareholders.[6]   It provides that:

> (1) Scott and Ruben will negotiate a shareholder agreement ("Shareholder Agreement") that will be applicable to all shareholders.   It will provide that Ruben will continue to be the CEO of Martin Resource Management Corporation ("MRMC") but the authority to conduct the day to day operations of MRMC will be subject to those responsibilities that are delegated to him by the Board of Directors of MRMC.   Scott shall have the ability to determine what authority the Board will delegate to Ruben.   Scott's duties will need to be more clearly defined and delegated by the Board as well.   The Shareholders Agreement will contain provisions typically found in large, complex corporations, including provisions governing liquidity for all the shareholders.   The parties will negotiate in good faith the provisions of the Shareholders Agreement and try to reach agreement on some form of buy-sell provisions contained therein.   Such buy-sell provision will be subject to a 1 yr. lockup period.   Finally, the Shareholder Agreement will require at least quarterly Board meetings.

It is undisputed that the parties never arrived at an agreement for the content of a shareholder agreement and never executed one.[7]

Paragraphs five through nine, eleven, and thirteen through fifteen each contain provisions that are triggered by the "Completion Date," as that term is defined in the agreement.[8]   The "Completion Date" is defined as the completion "of all of the obligations under this Settlement Agreement."   The dependent provisions include:   (1) Wes Skelton's resignation as MRMC

---

[6]Shareholder agreements in Texas are subject to the requirements of Chapter 21, Subchapter C of the Texas Business Organizations Code—and require approval and ratification by all shareholders, among other things, to be effective. TEX. BUS. ORGS. CODE ANN. § 21.101(b) (Vernon 2010 pamphlet).

[7]Paragraphs two, three, and four of the agreement address treatment of MRMC assets, such as use of the MRMC planes, sale of any "Colorado house," and Scott's and Ruben's ability to invite whomever they wish to attend MRMC Board meetings.

[8]Each of these paragraphs is prefaced by the language, "Upon the Completion Date," or "On or before the Completion Date."

ESOP Trustee; (2) Scott's resignation as trustee for Ruben's family trusts; (3) MRMC's extension of employment agreements to Scott and Ruben; (4) Scott's, Ruben's, and the MRMC board members' execution of mutual releases from any and all claims related to issues subject to the agreement; (5) Ruben's transfer of one share of MRMC stock to Scott; (6) Neumeyer's and Skelton's resignations from MRMC's board, to be replaced by Ruben's and Scott's respective designees; (7) the extension of $2,000,000.00 loans to Scott and to Ruben, respectively, upon approval of Amegy (MRMC's financing arm); (8) reimbursement by MRMC of all legal fees incurred by Scott, Ruben, and Margaret Martin related to the negotiations; and (9) conversion of all outstanding MRMC stock options to "non-voting," to last until the termination of Angela's Trust.[9]

The bedrock of the instant dispute is that Ruben and Scott differ over the meaning of paragraph one of the settlement agreement. The interpretation of this paragraph is central to the issue of the agreement's enforceability. Ruben maintains that the plain meaning of the settlement agreement is that Scott and Ruben would spend sixty days (later extended to ninety days) to negotiate a shareholder agreement (paragraph one) and other items that would resolve the issues between them (the remaining provisions of the agreement). Although the parties negotiated for a period of ninety days, no shareholder agreement was reached, and none of the remaining

---

[9]The remaining paragraphs—ten, sixteen, seventeen, and nineteen—require that the MRMC Board could take action only by unanimous consent through the "Completion Date"; provide that Angela Alexander may be employed by MRMC at a location of her choosing, and state that both Scott and Ruben will be the MRMC representatives appointed to the Arcadia joint venture board of directors.

agreements were carried out.[10]  Ruben thus contends that because the obligations under the settlement agreement (including the negotiation of a shareholder agreement) were not completed, the "Completion Date" never occurred.  As a result, none of the dependent provisions were triggered.[11]

When an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding on the parties and merely constitutes an agreement to agree.  *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000), *superseded by statute on other grounds*, *Vantage Sys. Design, Inc. v. Raymondville Indep. Sch. Dist.*, 290 S.W.3d 312, 316 (Tex. App.—Corpus Christi 2009, pet. filed); *Sadeghi v. Gang*, 270 S.W.3d 773, 776 (Tex. App.—Dallas 2008, no pet.).  Said another way, a party cannot accept an offer so as to form a contract unless the terms of that contract are reasonably certain.  *Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 846.  Contract terms are reasonably certain "if they provide a basis for determining the existence of a breach and for giving an appropriate remedy."  RESTATEMENT (SECOND) OF CONTRACTS § 33(2) (1981).  If an alleged agreement is so indefinite as to make it impossible for a

---

[10]Ruben points out that many of the provisions of the settlement agreement require MRMC board approval.  Darren Inoff, attorney for Scott, drafted the settlement agreement.  Inoff provided Scott with a list of decisions that required MRMC board approval.  Those decisions include:  the election or removal of officers from the corporation; entering into or amending any employment or severance agreement with any officer or employee of the corporation, and all compensation programs (including base salaries and bonuses) for officers and key employees; the purchase, sale, lease, transfer or other acquisition or disposition of assets (including equity interests in any entity) in a transaction or series of transactions in excess of a given amount; any real estate lease or purchase; any commencement or settlement of any litigation; and approval of any other item specifically required elsewhere in the shareholder's agreement, bylaws, or articles of incorporation.  These categories of actions requiring board approval apply to paragraphs three, five, seven, eight, eleven, thirteen, fifteen, sixteen, and seventeen.

[11]Paragraph eighteen of the settlement agreement provides that "Scott and Ruben will use their good faith efforts to work through counsel to document the agreements contained herein within sixty (60) days of the Effective Date."

13

court to fix the legal obligations and liabilities of the parties, it cannot constitute an enforceable contract. *Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 455 (Tex. App.—Fort Worth 2009, pet. denied).

Conversely, enforceable settlement agreements need only "contain sufficient terms to determine the parties' obligations but [are] not required to resolve all disputed issues." *W. Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 258–59 (Tex. App.—Austin 2002, no pet.). "Where the evidence shows that the parties intended to enter into an agreement, the courts should find the contract to be definite enough to grant a remedy provided that there is a certain basis for determining the remedy." *America's Favorite Chicken Co.*, 929 S.W.2d at 623. Parties may therefore agree upon some contractual terms, understanding them to be an agreement, and leave other contract terms to be made later. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). It is only when an essential term is left open for future negotiation that there is nothing more than an unenforceable agreement to agree. *Id.* The parties here disagree regarding the enforceability of the contract based on (1) whether the completion date, as that term is defined in the agreement, was reached; and (2) whether the shareholder agreement was an essential term of the overall agreement.

### (1)    A Completion Date Was Not Reached

Ruben contends the parties, as a part of their "obligations" under the settlement agreement, were required to not only negotiate, but to actually reach a shareholder agreement, reduce it to

14

writing, sign it, and adopt it as an antecedent to the other obligations. Without this obligation being brought to fruition, a "Completion Date" never happens. Without a "Completion Date," none of the nine dependent provisions take place. In this scenario, the trial court could not determine what the parties' rights and obligations would be under the settlement agreement because the court could not possibly know what agreement the parties would have negotiated.

Scott contends the obligation was simply to negotiate (but not necessarily agree upon and adopt) a shareholder agreement, and the parties had sixty days in which to do so (later extended to ninety days). According to Scott, the "Completion Date" is reached by fulfilling the obligation to negotiate as set out by paragraph number one of the settlement agreement. In support of this position, Scott relies on *Geophysical Micro Computer Applications (Int'l) Ltd. v. Paradigm Geophysical Ltd.*, No. 05-98-02016-CV, 2001 WL 1270795, at *6 (Tex. App.—Dallas Oct. 24, 2001, pet. denied) (not designated for publication) (finding an obligation to "negotiate in good faith" satisfied "the mutuality of obligation requirement as a matter of law").

*Paradigm* involved a letter of intent regarding the purchase of computer software. The letter clearly identified the asset to be sold, its price and adjustments to the purchase price, royalties, a method to calculate the closing date, and the payment of financing terms. The letter of intent also provided for "other terms" regarding due diligence, responsibility for closing documents, and other "necessary commercial terms." There was no evidence in this summary judgment case that the "other terms" or other "necessary commercial terms" were essential for the

15

contract. The court held that the trial court improperly granted summary judgment because the evidence was disputed and the language in the document was inconclusive on whether the parties intended the agreement to be a memorialization of the parties' agreement or a condition precedent to the formation of a contract. *Id.* Paradigm also moved for summary judgment on the basis that the letters were not enforceable because they lacked mutuality of obligation, i.e., they were subject to the parties' corporate approval, and Paradigm's board had disapproved and rejected the transaction. Because the letter required the parties to negotiate in good faith, the mutuality of obligation requirement was satisfied as a matter of law; the issue of whether Paradigm discharged this obligation in good faith was a question of fact. *Id.* Because this case focuses on mutuality of obligations, and not whether an agreement to negotiate in good faith amounts to an enforceable contract, it is not persuasive. Mutuality of obligation does not render an otherwise unenforceable contract, lacking essential terms, enforceable.

Ruben maintains that an agreement to negotiate in the future is unenforceable, even if the agreement calls for a good-faith effort in negotiations, citing *John Wood Group USA, Inc. v. ICO, Inc*., 26 S.W.3d 12, 21 (Tex. App.—Houston [1st Dist.] 2000, pet. denied). This case involved a letter agreement for the sale of corporate assets, which stated that the essential terms of the proposed sale were "not binding." The jury awarded damages for breach of contract. On appeal, the appellant maintained that even if the sale provisions were held to be unenforceable—as they were—the damages should nevertheless stand because the Wood Group breached the good-faith

16

clause of the letter agreement, by which both parties intended to be bound. In support of that proposition, appellant relied on Illinois law, under which agreements to negotiate toward the formation of a contract are themselves enforceable as contracts. The court recognized, however, that under Texas law, an agreement to negotiate in the future is unenforceable, even if the agreement calls for a "good faith effort" in the negotiations. *Id*. at 21 (citing *Radford v. McNeny*, 129 Tex. 568, 104 S.W.2d 472, 474 (1937); *Maranatha Temple, Inc. v. Enter. Prods. Co*., 893 S.W.2d 92, 104 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (presence of term "good faith effort" in agreement not talismanic; its presence does not automatically mean the provision that contains this phrase is enforceable—an agreement to enter into good-faith negotiations in future not enforceable)).

Scott's argument, though creative, does not conform to Texas law. The shareholder agreement must be executed, not merely negotiated. The agreement itself supports this conclusion. Paragraph one states that the brothers "will negotiate a shareholder agreement" that "will be applicable to all shareholders." Since the goal of negotiation *is* agreement, if the parties are required to "negotiate an agreement," they must necessarily and ultimately conclude with a negotiated agreement. Otherwise, the parties have only attempted to negotiate an agreement. Additionally, paragraph one contains obligatory language which supports the conclusion that its terms require the execution of a shareholder agreement. It requires that (the shareholder agreement) "will provide," "will contain," and "will require." Imperative statements such as

17

these envision the object to be accomplished will, in fact, be accomplished. In failing to negotiate a shareholder agreement, the parties fell short of accomplishing this goal. Thus, the completion date—meaning completion "of all of the obligations under this Settlement Agreement"—was not reached because the obligation of executing a shareholder agreement was not completed. Without a completion date, Ruben contends the agreement is merely an agreement to agree in the future, which is not legally binding. *See Fort Worth Indep. Sch. Dist*., 22 S.W.3d at 846.

However, if the shareholder agreement provision of the agreement is not essential, as Scott contends, the agreement can nevertheless be enforced. *See T.O. Stanley Boot Co.*, 847 S.W.2d at 221 (only when essential term left open for future negotiation is agreement an unenforceable agreement to agree). We, therefore, must determine whether the shareholder provision is essential to the overall settlement agreement.

### (2)      The Shareholder Agreement Is Essential to the Settlement Agreement

Ruben maintains that each provision of the settlement agreement is essential because all obligations, i.e., each provision of the agreement, must be completed in order to reach the completion date.[12]  Even so, Ruben characterizes the shareholder provision as the "pearl" of the agreement, an essential provision. The issue of essential contractual provisions was recently addressed in *Playoff Corp.*, 300 S.W.3d 451.

---

[12]The definition of "Completion Date" as the completion of all obligations under the agreement, in light of the nine provisions to be concluded upon the completion date, creates a never-ending chain of events which cannot, logically, result in a completion date.

18

In that case, Blackwell brought suit against Playoff, a sports trading-card company, for breach of contract. *Id.* at 453. After finding that a breach of contract occurred, the jury found damages of $6.1 million, but the trial court granted a take-nothing judgment notwithstanding the verdict, holding that the agreement was "legally unenforceable." *Id*. at 454. The Fort Worth court affirmed. The matters in dispute in *Playoff* involved an employment agreement, the most hotly contested provision of which involved the issue of payment by Playoff, the employer, to Blackwell, the employee. That provision was summarized as follows:

> Playoff . . . would pay Blackwell 25% of the proceeds from the sale of Playoff or entities contemplated to be formed by the parties, if any, after reducing the proceeds from the sale by $ 5,000,000.00 (Playoff's agreed fair market value at the time of the alleged employment agreement); or 25% of the fair market value of Playoff or entities contemplated to be formed by the parties, if any, after reducing the fair market value by $ 5,000,000.00, on the last day of his employment if Playoff or any entity contemplated to be formed by the parties terminated Blackwell's employment.

*Id* at 453. Because the term "fair market value" was to be determined by "additional negotiation and agreement between the parties," the "alleged agreement left a material matter open for future adjustment and agreement that never occurred." *Id*. at 457. Consequently, the agreement was unenforceable as a matter of law. *Id.*

In contrast to *Playoff*, Scott maintains that while the parties contemplated future negotiations on some issues, including the shareholder provision, future negotiations do not negate contractual intent as a matter of law. *Komet v. Graves*, 40 S.W.3d 596, 601–02 (Tex. App.—San

19

Antonio 2001, no pet.). In that case, an employment agreement set out the material terms of the employee's salary and benefits, but also provided the following provisions: "[a] commission schedule structure shall be created and mutually agreed to and incorporated into this agreement" that was "to be determined by a future document" and an "[e]quity agreement to be determined in subsequent document." *Id.* at 599. Because the agreement set out the effective date, salary, health insurance provisions, and vacation time and other benefits, the parties' obligations were sufficiently outlined. In *Komet*, the court determined that the percentages were not material and therefore could "be left open for future negotiations without destroying the contract's effectiveness." *Id.* at 602. Because *Komet* determined that no essential provision was left to future negotiation, the contract was enforceable.

Scott makes the same argument in this case. He contends that the shareholder agreement was not essential to the overall agreement because it was not imperative or indispensible, pointing out that the installation of a four-member board was not predicated on the existence of a shareholder agreement[13] (which, according to Scott, was the key essential term to the entire

---

[13]The provision requiring a four-member board is not a part of the shareholder agreement; it is contained in paragraph eleven of the settlement agreement. Paragraph eleven states:

> Upon the Completion Date, Don Neumeyer and Wes Skelton will resign from the MRMC Board. Ruben and Scott will each have the right to appoint 1 additional Board member, it being assumed (but not required) that Bob Bondurant will be Ruben's appointment and Mike Gayler will be Scott's appointment. Courtney Stovall and Angela Alexander shall also be appointed as advisory, non-voting Board members. This shall be accomplished through a Unanimous Consent of Shareholders. Under no circumstances will these changes constitute a Change of Control under any employment agreement, retention or severance agreement or any other agreement entered into by MRMC. The current Board shall execute a written consent authorizing these Board changes to

20

agreement).[14] To effectuate the settlement agreement, the four-member board of directors would come first, and then the other documents would "fall into place."[15] Therefore, even when negotiations on the shareholder agreement failed, the remaining provisions of the settlement agreement were—in Scott's estimation—enforceable.

What terms are "material" or essential to a contract should be determined on an agreement-by-agreement basis. *T.O. Stanley Boot Co.*, 847 S.W.2d at 221 ("Each contract should be considered separately to determine its material terms."). A close corporation such as MRMC may, by statute, be managed either by a board of directors or in the manner provided for in a shareholders' agreement. TEX. BUS. CORP. ACT ANN. art. 12.31(A)(2) (Vernon 2003).[16] By statute, a shareholder agreement may restrict the discretion or powers of the board of directors. Or, the agreement can eliminate the board of directors and authorize the business and affairs of the

confirm that these changes shall not constitute a Change of Control. The composition of the Board cannot be changed until The R.S. Martin Jr., Children's Trust No. One f/b/o Angela Santi Jones (also known as Angela J. Alexander) ("Angela's Trust") terminates upon which time any shareholder shall be entitled to call a special meeting for the purpose of proposing a new slate of directors of the MRMC Board. The Bylaws shall be amended accordingly to permit this Board composition (since Bylaws currently require seven (7) Board members).

[14]After a hard fought battle, Scott and Ruben agreed on a board of Scott and his designee and Ruben and his designee. It was not Scott's intention that the four-member board be contingent on or subject to the successful negotiation of a shareholder agreement. The four-member board provision does appear to be an essential provision of the overall agreement, given the degree of specificity it contains. That does not, however, resolve the issue of whether the shareholder provision is essential to the settlement agreement.

[15]Both Scott and Ruben testified they could vote 100% of the shares of MRMC. Scott testified, with respect to paragraph eleven, that if Skelton did not want to resign, he could be made to resign. Scott and Ruben controlled the MRMC board vote on January 29, 2008, so any provisions requiring action by the board of directors could be effectuated by their board votes. The MRMC board appoints the trustees of the ESOP as well, so the board could also effectuate changes to the ESOP.

[16]This section of the Business Corporation Act expired on January 1, 2010, but was in effect at the time the settlement agreement was executed. TEX. BUS. CORP. ACT ANN. art. 11.02 (Vernon Supp. 2010).

corporation to be managed by one or more of its shareholders or other persons. TEX. BUS. ORGS. CODE ANN. § 21.101(b)(1).

Paragraph one of the settlement agreement provides that the shareholder agreement will delegate responsibility to Scott to determine what authority the board of directors will delegate to Ruben to conduct the day-to-day operation of the corporation. Scott's duties are to be more clearly defined and delegated by the board. Further, the agreement will contain provisions "typically found in large, complex corporations, including provisions governing liquidity for all shareholders." The agreement will also include buy-sell provisions, "subject to a 1 yr. lockup period." Sufficient detail regarding corporate management and financial governance is built into paragraph one to convince this Court that the shareholder agreement was essential to the overall settlement agreement.

Further, the proposed shareholder agreements drafted during the course of the parties' negotiations are detailed and comprehensive. The most recent (failed) draft of the shareholder agreement was thirty pages in length with a detailed table of contents. The draft shareholder agreement addressed restrictions on disposition of shares, voluntary lifetime transfers, involuntary lifetime transfers, purchase of shares on the death of a shareholder or spouse of a shareholder, general provisions relating to transfers, voting agreements, covenants of the corporation, and a number of miscellaneous provisions. Each of these areas covered additional sub-topics in

22

meticulous detail; each of these provisions can be excruciatingly complex and subject to intense negotiation.

While Scott maintains the shareholder agreement is not essential, a plain reading of the entire agreement indicates otherwise. The shareholder agreement, as envisioned in the settlement agreement and as reflected by the drafts produced in negotiations, would be the foundational document of MRMC and would define the parties' rights vis-à-vis each other and MRMC. Moreover, the shareholder agreement was fundamental to the enforcement of nine of the remaining eighteen paragraphs which, by their express language, are dependent on completion of all of the obligations under the agreement.

Because the settlement agreement leaves this essential provision open for future agreement that never occurred, it is not binding and merely constitutes an agreement to agree in the future. *See Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 846; *Playoff Corp.*, 300 S.W.3d at 455; *Meru v. Huerta*, 136 S.W.3d 383, 391 (Tex. App.—Corpus Christi 2004, no pet.). As such, it cannot be enforced.

Because we find the settlement agreement to be unenforceable as a matter of law, we need not address the issue of whether the trial court erred in (1) awarding money damages and specific performance for a breach of contract and (2) awarding costs.

We reverse the judgment of the trial court and render a take-nothing judgment.

23

Bailey C. Moseley
Justice

Date Submitted:     October 13, 2010
Date Decided:       November 3, 2010