Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio



# MEMORANDUM OPINION

No. 04-10-00620-CV

**HMC HOTEL PROPERTIES II LIMITED PARTNERSHIP** and Host Hotels & Resorts,
Inc. f/k/a Host Marriott Corporation and Host Hotels & Resorts, L.P. f/k/a Host Marriott, L.P.,
Appellants/Cross-Appellees

v.

**KEYSTONE-TEXAS PROPERTY HOLDING CORPORATION**,
Appellee/Cross-Appellant

From the 166th Judicial District Court, Bexar County, Texas
Trial Court No. 05-CI-14229
Honorable Martha Tanner, Judge Presiding

Opinion by:     Catherine Stone, Chief Justice

Sitting:         Catherine Stone, Chief Justice
              Phylis J. Speedlin, Justice
              Marialyn Barnard, Justice

Delivered and Filed:   November 23, 2011

AFFIRMED IN PART; REVERSED AND RENDERED IN PART

This lawsuit arises out of actions taken in relation to a proposed sale of property in San Antonio commonly known as the Rivercenter Mall and Marriott Rivercenter Hotel. Keystone-Texas Property Holding Corp. owned the mall and the land underlying the hotel. HMC Hotel Properties II Limited Partnership leased the land underlying the hotel from Keystone pursuant to a long-term ground lease. HMC sued Keystone for breach of the lease. Keystone filed counterclaims against HMC for slander of title and tortious interference with an agreement

Keystone had with a third party to purchase the property. Keystone also asserted the same claims against HMC's parent corporation, Host Hotels & Resorts, Inc. f/k/a Host Marriott Corporation and Host Hotels & Resorts, L.P. f/k/a Host Marriott, L.P. A jury rejected HMC's breach of contract claim, and instead found in favor of Keystone on both of its claims. HMC/Host appealed the resulting judgment raising numerous issues, and Keystone filed a cross-appeal.

## BACKGROUND

In 1992, the Pennsylvania Public School Employees' Retirement System (PSERS) acquired both the land underlying the Marriott Rivercenter Hotel, subject to HMC's ground lease, and Rivercenter Mall. PSERS formed Keystone as a subsidiary to own the property. L&B Realty Advisors was retained to manage the property. In 2000, PSERS decided to sell its direct-owned real estate.

In October of 2003, Michael Grubic, the portfolio manager with PSERS responsible for overseeing L&B's actions relating to the Rivercenter property, contacted John Gerdes, the executive vice-president with L&B in charge of the Rivercenter property, and urged him to consider whether Keystone should sell the property. Grubic contacted Gerdes after learning that a mall in Maine had sold for a very good price. Based on recommendations by Grubic's supervisor, on April 27, 2004, the PSERS board of directors authorized the property to be marketed for sale. In June of 2004, Keystone retained a law firm to represent it in the marketing and potential sale of the property. In July of 2004, Holliday, Feloglio, and Fowler ("HFF"), an investment brokerage firm, was retained to market the property. HFF decided to use a marketing price of $170-180 million and believed the property would sell for $155-165 million.

An offering memorandum was prepared and sent to a list of potential investors. Host/HMC was not on the list. Based on the offers received, L&B recommended that PSERS accept an offer made by Ashkenazy Acquisition Corporation for $175 million. Ashkenazy had recently sold other real property and needed to close on the sale by December 31, 2004, in order for the capital tax on the prior sale to be deferred pursuant to a section 1031 exchange. After the recommendation was made that the PSERS board approve the offer by Ashkenazy, Ashkenazy had "buyer's remorse" about the price. Although the PSERS board approved a reduction in price to $165 million, the sale was not closed because Ashkenazy pursued a different asset, presumably to ensure the timing of his section 1031 exchange. HFF extended the deadline for offers based on the prior memorandum. Ashkenazy was again recommended as the proposed purchaser for $166 million. In December of 2004, the parties exchanged drafts of a letter of intent, and L&B received a $1 million escrow deposit on December 31, 2004.

Also in December 2004, following communication between Gerdes and Grubic, Gerdes determined that notice was required to be sent to HMC under section 14.02 of the ground lease which was entitled "Tenant's First Right of Negotiation."[1] Gerdes based the notice letter on a similar letter sent to HMC in connection with PSERS's purchase in 1992. Recognizing that HMC had requested an allocation of the purchase price between the mall property and the hotel property in 1992, Ashkenazy was asked to make an allocation of the $166 million purchase price. Ashkenazy allocated $65 million to the hotel property.

On January 7, 2005, Keystone sent HMC a letter notifying it of the pending sale of the hotel land to Ashkenazy for $65 million. The letter stated the sale was expected to close in seventy-five days. The letter further stated that HMC had a period of thirty days to notify

---

[1] Section 14.02 is quoted, in pertinent part, on pages 5-6 of this opinion.

Keystone of its intent to negotiate a purchase of the hotel land; however, Keystone requested that HMC sign a waiver of its rights to enable Keystone to proceed with the sale.

On February 1, 2005, Daniel Burke, the vice-president for asset management for Host, emailed Gerdes requesting more information about the specifics of the deal. After Gerdes and Burke spoke on February 8, 2005, Burke sent Gerdes an email dated February 11, 2005, expressing a potential interest in negotiating, stating HMC was unprepared to waive its rights, and requesting additional information. Burke informed Gerdes that Host believed the value of the hotel land was around $30 million. At that time, the sale of both the mall property and the hotel land was scheduled to close on March 28, 2005 (this date was important to Ashkenazy for another section 1031 deadline). On February 23, 2005, Gerdes sent Burke an email asking Burke to confirm whether he had received the requested information. Burke acknowledged receiving the information and informed Gerdes he would get back with him regarding a timeline.

In order to meet the section 1031 deadline, a decision was made to split the closing of the sale of the mall and the sale of the hotel land. The agreements contained a "clawback" provision that would enable Keystone to reacquire the mall if Ashkenazy defaulted on his purchase of the hotel land. The mall sale closed on March 29, 2005, and the sale of the hotel land was scheduled to close on April 28, 2005.

On March 17, 2005, Burke sent Gerdes an email stating that the waiver was close to being signed and sent back. Burke stated that he would like to speak with Ashkenazy and requested that Gerdes facilitate the contact. Burke stated that after he spoke with Ashkenazy, he would send the waiver back promptly.

Gerdes promptly contacted Ashkenazy to facilitate a meeting. Burke and another Host executive, Andrew Bruce Lewis, met with Ashkenazy, and Ashkenazy entertained the thought of

flipping the hotel land to Host. At a subsequent meeting between Ashkenazy and Lewis, however, Ashkenazy explained that the financing of the transaction would not permit him to flip the land. Based on these meetings, HMC/Host developed the opinion that the allocation of the purchase price was a sham intended to get HMC/Host out of the way as an impediment to the sale. Although HMC/Host formulated this opinion and believed that Section 14.02 of the lease had been violated, HMC/Host did not share this opinion with Keystone.

On April 15, 2005, HMC signed an estoppel certificate stating that the lease was not in default. Around this same time, Ashkenazy's lender requested a different estoppel certificate form that contained language waiving the Section 14.02 first right of negotiation. Gerdes continued to request updates from Burke and received one message in which Burke stated that Host's acquisition people were supposed to contact Gerdes to discuss a purchase.

Finally, on April 18, 2005, Host sent a letter to Keystone stating that Keystone was in default under Section 14.02. Host demanded an additional 90-day period in which to negotiate the purchase of the hotel land. The sale of the hotel land to Ashkenazy, which was scheduled to occur on April 28, 2005, did not close, and the underlying litigation ensued.

### SECTION 14.02 OF THE LEASE

Section 14.02 of the ground lease to HMC ("Lease") entitled "Tenant's First Right of Negotiation" provides, in pertinent part:

> If Landlord decides to sell the Leased Premises to a third party, Landlord will give Tenant notice of such decision and afford Tenant a reasonable period of time as specified in such notice, but in no event more than ninety (90) days, in which to attempt to negotiate a mutually satisfactory agreement for purchase of the Leased Premises. If after expiration of ninety (90) days following the date of Landlord's notice of its desire to sell the Leased Premises Landlord and Tenant are not able or willing to enter into a mutually acceptable agreement for purchase of the Leased Premises, Landlord shall be free to sell the Leased Premises to a third party at a sales price and upon financing arrangements, if any, not more favorable to such third party than Landlord was willing to sell the Leased

Premises to Tenant and subject to the following further condition: Landlord shall give Tenant notice of the proposed sale of the Leased Premises, which notice shall disclose the identity of the proposed purchaser and all information regarding such purchaser and all material information regarding the terms and conditions of such sale.

The first question submitted to the jury asked whether Keystone failed to comply with Section 14.02 of the Lease. The jury was instructed that Section 14.02 required that Keystone notify HMC sufficiently prior to selling the hotel land to permit a proper notice period for HMC to negotiate. The jury answered "no."

In its first issue, HMC/Host contends the jury's answer to Question No. 1 was fatally flawed because the trial court's construction of Section 14.02 was incorrect as a matter of law, and the evidence conclusively established that Keystone breached the Lease. Alternatively, HMC/Host asserts: (1) Section 14.02 is ambiguous requiring a new trial; or (2) the trial court's erroneous instructions relating to Question No. 1 require a new trial. In its cross-appeal, Keystone contends the trial court erred in failing to enter a declaratory judgment that Section 14.02 is unenforceable as a matter of law.

## A.     Enforceability of Section 14.02

Whether a particular agreement is legally enforceable is a question of law reviewed *de novo*. *Martin v. Martin*, 326 S.W.3d 741, 747 (Tex. App.—Texarkana 2010, pet. denied); *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 72 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). In general, an agreement is legally binding only if its terms are sufficiently definite to enable a court to understand the parties' obligations. *Fort Worth Ind. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000). An agreement to make a future contract is legally enforceable only if it does not leave material terms open for future negotiation. *Id.*; *Martin*, 326 S.W.3d at 749. Under Texas law, an agreement to negotiate in the future is

unenforceable, even if the agreement calls for a good faith effort in the negotiations. *See Radford v. McNeny*, 129 Tex. 568, 104 S.W.2d 472, 474-75 (1937); *Martin*, 326 S.W.3d at 750-51; *John Wood Group USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 21 (Tex. App.—Houston [1st Dist.] 2000, pet. denied); *Maranatha Temple, Inc. v. Enter. Prods. Co.*, 893 S.W.2d 92, 104 (Tex. App.—Houston [1st Dist.] 1994, writ denied). Such an agreement to negotiate is unenforceable because "[t]here would be no way by which the court could determine what sort of a contract the negotiations would result in, no rule by which the court could ascertain whether any, or, if so, what damages might follow a refusal to enter into such future contract." *Radford*, 104 S.W.2d at 474-75.

Generally, the cases are fairly clear in applying the law that an agreement to negotiate in the future is unenforceable because the terms are insufficiently definite to enable a court to ascertain damages. For example, in *Radford*, the court considered whether a commission was owed to a realtor where the contract provided for payment of the commission upon the making of a lease "on such terms, or such others as I may accept." 104 S.W.2d at 473. The court held that since the contract between the lessor and the lessee was subject to the lessor negotiating and agreeing to the terms, the agreement was too indefinite to enforce where no actual lease was signed. *Id*. at 474. Similarly, in *Maranatha Temple, Inc.*, the oral agreement in question stated that an individual was to meet with a company's representatives in good faith to address a problem. 893 S.W.2d at 104. The court held that the parties had agreed to do nothing more than enter into good faith negotiations in the future concerning what to do about the problem. *Id.*

Finally, and most similar to the facts of the instant case, in *Martin*, two shareholders reached a settlement agreement containing multiple provisions, including a provision stating that they would negotiate a shareholder agreement in good faith for sixty days (later extended to

ninety days) that would be applicable to all shareholders.  326 S.W.3d at 744, 747-48.  Because

the shareholders never agreed on the content of a shareholder agreement, such an agreement was

never executed.  *Id*. at 748.  One of the two shareholders, Ruben, argued that the agreement

required the shareholders to both negotiate and reach a shareholder agreement in order for the

settlement agreement to be enforceable.  *Id*. at 749.  The other shareholder, Scott, argued that the

obligation was simply to negotiate, and the settlement agreement was still enforceable even

though no shareholder agreement was signed.  *Id*. at 750.  The court rejected Scott's argument,

concluding:

> Scott's argument, though creative, does not conform to Texas law.  The shareholder agreement must be executed, not merely negotiated.  The agreement itself supports this conclusion.  Paragraph one states that the brothers "will negotiate a shareholder agreement" that "will be applicable to all shareholders." Since the goal of negotiation *is* agreement, if the parties are required to "negotiate an agreement," they must necessarily and ultimately conclude with a negotiated agreement.  Otherwise, the parties have only attempted to negotiate an agreement. Additionally, paragraph one contains obligatory language which supports the conclusion that its terms require the execution of a shareholder agreement.  It requires that (the shareholder agreement) "will provide," "will contain," and "will require."  Imperative statements such as these envision the object to be accomplished will, in fact, be accomplished.  In failing to negotiate a shareholder agreement, the parties fell short of accomplishing this goal.  Thus, the completion date--meaning completion "of all of the obligations under this Settlement Agreement"--was not reached because the obligation of executing a shareholder agreement was not completed.  Without a completion date, Ruben contends the agreement is merely an agreement to agree in the future, which is not legally binding.

*Id*. at 751.  The court agreed with Ruben's argument.  After concluding that the shareholder

agreement was an essential provision of the overall agreement, the court concluded, "Because

the settlement agreement leaves this essential provision open for future agreement that never

occurred, it is not binding and merely constitutes an agreement to agree in the future."  *Id*. at 754.

Accordingly, the court held the settlement agreement was unenforceable as a matter of law.  *Id*.

Section 14.02 of the Lease is distinguishable from the settlement agreement in *Martin* in one very important detail. Section 14.02 recognizes on its face that an actual agreement may not result from the negotiations. The goal of the negotiations required by Section 14.02 is, therefore, not an actual enforceable agreement. Instead, the goal of the negotiations is to establish the terms on which the HMC was willing to purchase the hotel land. The establishment of these terms is important in and of itself because those terms would establish a threshold below which Keystone could not go in selling the property to a third party. Under Section 14.02, Keystone was free to sell to a third party only at a sales price not more favorable than the sales price established in the negotiations between HMC and Keystone. As a result, a court could readily determine whether Keystone breached Section 14.02 by selling to a third party on more favorable terms. Because the terms of Section 14.02 are sufficiently definite to enable a court to understand the parties' obligations thereunder, the trial court properly determined that Section 14.02 was enforceable. *Fort Worth Ind. Sch. Dist.*, 22 S.W.3d at 846.

**B.      Construction/Interpretation of Section 14.02**

The interpretation or construction of an unambiguous contract is a question of law for the court, which is reviewed on appeal *de novo*. *Willis v. Donnelly*, 199 S.W.3d 262, 275 (Tex. 2006); *Alamo Cmty. College Dist. v. Browning Const. Co.*, 131 S.W.3d 146, 155 (Tex. App.— San Antonio 2004, pet. denied). "In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). When discerning the contracting parties' intent, courts must examine the entire agreement in an effort to harmonize and give effect to each provision so that none is rendered meaningless. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). "No single provision taken alone will be given controlling effect;

rather, all the provisions must be considered with reference to the whole instrument." *Coker*, 650 S.W.2d at 393.

HMC/Host contends the agreement required Keystone to provide notice when it reached a decision to market the property for sale. HMC/Host argues that notice was required to be provided before Keystone hired consultants to market and solicit bids. HMC/Host strenuously argues that notice was required before Keystone targeted a potential buyer and agreed to negotiate exclusively with that buyer. Finally, HMC/Host asserts Section 14.02 required Keystone to negotiate with HMC before it negotiated with third parties.

On the other hand, Keystone contends that notice was not required until a decision was made to sell to an identified third-party buyer. Keystone asserts Section 14.02 contains no language requiring it to exclusively negotiate with HMC, and courts cannot "rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained." *Tenneco, Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996).

Examining Section 14.02 in its entirety, we agree with the trial court's and Keystone's interpretation of the provision. We are persuaded by the language following the effect of the inability or unwillingness of Keystone and HMC to enter into a mutually acceptable agreement. Section 14.02 provides that in such an event, "Landlord shall be free to *sell* the Leased Premises to a third party . . . ." (emphasis added). If Keystone was required to negotiate exclusively with HMC, this provision would have read, "Landlord shall be free to *negotiate* the sale of the Leased Premises to a third party . . . ." We are also persuaded by Keystone's argument regarding an identified third party. If the third party and the potential terms of a sale are unknown, how could the Landlord "decide" to "sell" the hotel land to a third party? In the absence of a known

purchaser and price, the Landlord might have decided to negotiate the sale of the hotel land, but certainly could not have decided to sell it.

Finally, HMC/Host's interpretation would raise concerns with the following scenario: a third-party purchaser unexpectedly approaches Keystone and offers to purchase the property for $1 billion. Keystone could immediately "decide" to "sell" the hotel land to that person; however, there would have been no opportunity for prior notice and negotiation with HMC. As a result, according to HMC/Host's interpretation, Keystone would be in breach of Section 14.02. This necessarily would be inconsistent with the true intentions of the parties.

## C.   Ambiguity

In an alternative argument, HMC/Host contends Section 14.02 is ambiguous; therefore, a new trial is necessary. Deciding whether a contract is ambiguous is a question of law for the court. *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). A contract is unambiguous if it can be given a definite or certain legal meaning. *J.M. Davidson, Inc.*, 128 S.W.3d at 229. "A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation." *Dynergy Midstream Servs., Ltd. P'ship*, 294 S.W.3d at 168. "A contract is not ambiguous simply because the parties disagree over its meaning." *Id.*

In this case, Section 14.02 can be given a definite or certain legal meaning and, for the reasons previously stated, HMC/Host's interpretation of Section 14.02 is not reasonable considering the language as a whole. The contract is not ambiguous simply because the parties disagree over its interpretation. *See id.* Accordingly, we hold Section 14.02 is not ambiguous.[2]

_____

[2] Keystone contends HMC/Host waived the argument that Section 14.02 is ambiguous by not objecting to the jury charge and requesting questions pertaining to its ambiguity. The Texas Supreme Court, however, has rejected such

**D.     Jury Charge**

In a second alternative argument, HMC/Host contends the trial court impermissibly commented on the weight of the evidence in providing the instruction that accompanied Question No. 1 and in providing a supplemental instruction in response to a note from the jury.

A trial court is required to give "such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX. R. CIV. P. 277. "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855-56 (Tex. 2009). "Determining necessary and proper jury instructions is a matter within the trial court's discretion, and appellate review is for abuse of that discretion." *Id.*

The instruction that accompanied Question No. 1 stated, "Section 14.02 required that Keystone notify HMC sufficiently prior to selling the Land to permit a proper notice period for HMC to negotiate." The jury sent a note during deliberations stating, "We need clarification of 'prior to selling' wording [sic] is it before it's sold, or before they even market & find a buyer." In response, the trial court submitted the following instruction, "You are instructed that Section 14.02 of the lease did not require Keystone to immediately notify HMC upon deciding to sell the land, upon marketing the property or upon finding a buyer."

HMC/Host initially argues that the original instruction was erroneous because it went further than simply tracking the language of Section 14.02. HMC/Host appears to be arguing that the instruction was required to mirror the contractual language. The case cited by HMC/Host in support of its contention, however, is readily distinguishable. *See Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 846-47 (Tex. 2005). In *Sterling Trust Co.*, the trial court

---

a waiver argument. In responding to a dissenting opinion, the majority of the court in *J.M. Davidson, Inc.*, asserted, "Justice Schneider implies that, because the parties do not contend the agreement is ambiguous, we may not hold that it is. This is contrary to Texas law." 128 S.W.3d at 231.

submitted an instruction to the jury listing three actions that would constitute a breach of fiduciary duty; however, the instruction failed to take into consideration the parties' contractual agreement which expressly modified the nature of the fiduciary duty that was owed. *Id*.

Keystone responds that the instruction simply informed the jury of the proper interpretation of Section 14.02, which the trial court had determined as a matter of law. "If the construction of a contract provision is in dispute, and the trial court resolves the dispute by interpreting the provision (*i.e.*, rather than by finding it ambiguous), the court should include its interpretation in submitting the question on whether the contract was breached." *Union Natural Gas Co. v. Enron Gas Marketing, Inc.*, 14-98-00183-CV, 2000 WL 350546, at *5 (Tex. App.— Houston [14th Dist.] Apr. 6, 2000, no pet.) (not designated for publication) (citing comment to Texas Pattern Jury Charges). We agree with this reasoning. Because the trial court interpreted the contract as a matter of law, the jury was required to follow that interpretation. Accordingly, the instruction accurately stated the law and assisted the jury.

The supplemental instruction is also a correct statement of the law. HMC/Host cites cases concluding that sometimes the submission of correct statements of the law is nonetheless an erroneous comment on the weight of the evidence. In this case, however, allowing the jury to resolve the question posed would have erroneously permitted the jury to decide a question of law. As a matter of law, based on the trial court's interpretation of Section 14.02, the activities raised in the question by the jury would not result in a breach of Section 14.02. Instructing the jury on that basis was not a comment on the weight of the evidence; it was an instruction on the applicable law.

**SLANDER OF TITLE**

HMC/Host challenges the sufficiency of the evidence to support various elements of Keystone's slander of title claim arguing that Keystone offered "no evidence" to support those elements.[3] To prove slander of title, Keystone was required to show that HMC/Host published false statements maliciously, and these statements caused special damage to Keystone's estate or interest in land. *See Santa Fe Energy Operating Partners, L.P. v. Carrillo*, 948 S.W.2d 780, 785 (Tex. App.—San Antonio 1997, writ denied).

We review a legal sufficiency or "no evidence" challenge under the well-established principles set forth in *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Reviewing the evidence in the light most favorable to the finding and indulging every inference that would support it, we sustain a no-evidence challenge only if: (1) the record reveals a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id*. at 810, 822. The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Id*. at 819.

**A.  Publication**

As previously noted, one of the elements of slander of title is the "publication" of a false statement. *Id*. *Santa Fe Energy Operating Partners, L.P.*, 948 S.W.2d at 785. It is undisputed that Keystone provided HMC's April 18 letter to Ashkenazy and the title companies. HMC/Host provided the letter only to Keystone.

---

[3] Although HMC/Host makes reference to factual insufficiency in the heading of this issue, HMC/Host only argues that Keystone offered "no evidence."

Both parties briefed the publication issue based on the law governing self-publication which several intermediate courts, including this court, have recognized through the adoption of Comment M to section 577 of the Restatement (Second) of Torts. *See, e.g., Austin v. Inet Tech., Inc.*, 118 S.W.3d 491, 499 (Tex. App.—Dallas 2003, no pet.); *Gonzales v. Levi Strauss & Co.*, 70 S.W.3d 278, 283 (Tex. App.—San Antonio 2002, no pet.); *AccuBanc Mortg. Corp. v. Drummonds*, 938 S.W.2d 135, 147-48 (Tex. App.—Fort Worth 1996, writ denied); *Doe v. SmithKline Beecham Corp.*, 855 S.W.2d 248, 259 (Tex. App.—Austin 1993), *aff'd as modified on other grounds*, 903 S.W.2d 347 (Tex. 1995). The problem with this approach, however, is that the trial court denied Keystone's requested jury charge relating to self-publication.

The jury charge, as submitted, asked, "Did Host Marriott slander Keystone's title to the Land." The jury charge then listed the five elements that were required to be proven to show slander of title, including, "the defendant publishes its false statement with legal malice." The jury charge defined "publishing" as "intentionally or negligently communicating the matter to a person other than Keystone who is capable of understanding its meaning." Keystone requested that the jury also be instructed as follows, "If the circumstances indicate that communication to a third party is reasonably forseeable, then it is proper to find that a publication occurred." At the formal charge conference, Keystone's attorney objected to the jury charge's failure "to include an instruction regarding communications that a maker can reasonably foresee will be disseminated to a third party."

Based on the law, it is clear that Keystone was requesting an instruction on self-publication. The record is unclear, however, regarding the reason the trial court denied the request. The trial court could have denied the request believing that self-publication requires both that the dissemination to a third party was reasonably foreseeable, and that the defamed

person's communication of the defamatory statements to the third person was made without an awareness of their defamatory nature. *See, e.g., Austin*, 118 S.W.3d at 499; *Gonzales*, 70 S.W.3d at 283; *AccuBanc Mortg. Corp.*, 938 S.W.2d at 147-48; *Doe*, 855 S.W.2d at 259; *but see Chasewood Const. Co. v. Rico*, 696 S.W.2d 439, 445-46 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.). Regardless of the trial court's reasoning, neither party has complained on appeal that the jury charge was erroneous as submitted.

More importantly for purposes of our analysis, neither party objected or requested an additional instruction regarding the definition of the term "negligently communicating" as that term was used in defining "publishing." In considering whether the evidence supports the jury's finding with regard to the publication element of the slander of title claim, however, this court must consider whether the jury could have believed that Host Marriott negligently published the April 18 letter.

Comment K to the Restatement (Second) of Torts explains that a party's communication to a third party is negligent "[i]f a reasonable person would recognize that an act creates an unreasonable risk that the defamatory matter will be communicated to a third person." RESTATEMENT (SECOND) OF TORTS § 577 cmt. k (1977); *see also Wheeler v. Methodist Hosp.*, 95 S.W.3d 628, 639-40 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (citing comment k); *First State Bank of Corpus Christi v. Ake*, 606 S.W.2d 696, 701 (Tex. App.—Corpus Christi 1980, writ ref'd n.r.e.) (citing comment k). Negligent publication exists where the speaker makes a statement "expecting that the statement would *have* to be repeated" to a third party. *Chasewood Const. Co.*, 696 S.W.2d at 449 (Reeves, J., dissenting). Under negligent publication, communication to the third party rises to the level of necessity, i.e., the speaker's words are

required to be repeated because of some necessity. *Id*. This is a far more stringent test than the reasonable foreseeability required in relation to self-publication under Comment M.

Although neither party requested that the jury be expressly instructed regarding the definition of negligent publication, Keystone's attorney referred to negligent publication in his closing argument as follows:

> Did they utter and publish a disparaging comment about the plaintiff's title to property? Well, what does publish mean? Intentionally or negligently communicating to a person other than Keystone.
> Well, I've already argued until I'm blue in the face about what they knew was going to happen when they sent that letter. And they knew we were going to give it to them. And they could have expected that and they sure would have wanted to get it. We believe that is negligently publishing it so that it goes to third parties.

Ashkenazy's attorney, David Kriss, testified that he believed Keystone was required to disclose the April 18 letter. Moreover, as noted by Keystone's attorney during oral argument, section 5.5 of the Agreement for Sale and Purchase required Keystone to deliver to Ashkenazy any correspondence pertaining to the Lease. One of Keystone's attorneys, Laura Sims, testified that Keystone was required to forward the letter to all material parties to the transaction. Sims stated that Keystone had an obligation to send the letter to the buyer and the title companies or risk being accused of fraud by concealing a material fact. Therefore, the evidence supports the jury's finding based on negligent publication.

## B. Malice

Actual malice is characterized by ill-will, spite, evil motive, or purposing the injuring of another. *Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 452 (Tex. 1996). Implied or legal malice, on the other hand, exists when wrongful conduct is intentional and without just cause or excuse. *Id*. Slander of title requires proof of "legal malice," which this court has

defined as "making false statements regarding title in absence of color of title or a reasonable belief that parties have title." *Santa Fe Energy Operating Partners, L.P.*, 948 S.W.2d at 785.

HMC/Host contends malice is negated by the fact that it relied on an attorney's advice in sending the letter. In *Humble Oil & Refining Co. v. Luckel*, 171 S.W.2d 902, 906 (Tex. Civ. App.—Galveston 1943, writ ref'd w.o.m.), the court stated, "It is also well settled that a claim of title does not constitute malice where such claim is made under color of title upon the advice of attorneys, or upon reasonable belief that a party has title to the property acquired." In order for the advice of an attorney to negate legal malice, however, the claim still must be made under color of title. HMC/Host argues that no evidence was presented showing that it acted with legal malice because asserting HMC/Host's "§ 14.02 rights [was] a reasonable course of conduct under the circumstances." We disagree.

HMC/Host's letter is based on its erroneous belief about the rights it had under Section 14.02. As previously discussed in relation to HMC/Host's issues regarding the breach of contract claim, however, the contract is unambiguous and is not "reasonably" susceptible to more than one interpretation. Section 14.02 did not provide HMC/Host with a contractual right to exclusively negotiate with Keystone before Keystone negotiated with a third party. Accordingly, HMC/Host was not acting under color of title in claiming that Section 14.02 entitled them to such a right. Moreover, Keystone had provided notice to HMC/Host on January 7, 2005; however, HMC/Host's letter demanded an additional ninety day period to negotiate despite the fact that ninety days had elapsed since HMC/Host received notice and never made a purchase offer during that ninety day period. Because Section 14.02 unambiguously did not provide HMC/Host the rights demanded in the April 18 letter, the evidence supports the jury's finding that HMC/Host was not acting under a color of title, but sent the letter maliciously.

**C.    False Statement**

To establish slander of title, the evidence must show that a "false" statement was published. *Santa Fe Energy Operating Partners, L.P.*, 948 S.W.2d at 785. If only true statements are published, no cause of action for slander of title lies. *McCarty v. Montgomery*, 290 S.W.3d 525, 540 (Tex. App.—Eastland 2009, pet. denied).

The assertion by HMC/Host that no false statements were published is again based on its contention that it properly construed the Lease. Because we have held that the Lease did not provide HMC/Host with a right to an exclusive negotiating period, the statements in the April 18 letter were false.

**D.    Damages**

The plaintiff must demonstrate the loss of a specific sale in order to recover for slander of title. *Marrs & Smith P'ship v. D.K. Boyd Oil & Gas Co.*, 223 S.W.3d 1, 20 (Tex. App.—El Paso 2005, pet. denied). The jury charge instructed that the damages to be awarded for slander of title were "[t]he difference, if any, between the price for which the Land would have been sold to Ashkenazy and the market value of the Land today, less the costs, if any, that Keystone would have incurred in completing the sale."

HMC/Host contends the evidence is insufficient to support the damage award because Keystone relied on a year-old appraisal as proof of the fair market value of the hotel land at the time of trial. In *Finch v. Finch*, 825 S.W.2d 218, 223 (Tex. App.—Houston [1st Dist.] 1992, no writ), the appellant argued that a trial court could not consider an appraisal of real estate made one year before the date of divorce in dividing real estate on the date of divorce. The Houston court rejected this argument. *Id.* The court first noted that the appellant cited no authority in support of the contention. *Id.* Similarly, no authority is cited by HMC/Host. Furthermore, the

court asserted, "whether an appraisal is near enough in time to the date of divorce to be considered in determining the value of the land in question is left to the discretion of the trial court." *Id.* That discretion in this case was left to the jury in evaluating the weight to be given to the appraisal in question.

### CAUSATION

In its second issue, HMC/Host challenges the sufficiency of the evidence to prove causation with regard to Keystone's tortious interference claim and its slander of title claim.

More than one act may be the proximate cause of the same injury. *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 784 (Tex. 2001). Proximate cause has two elements: cause in fact and foreseeability. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 122 (Tex. 2009); *Lee Lewis Const., Inc.*, 70 S.W.3d at 784. Cause in fact must be established by proof that (1) the act or omission was a substantial factor in bringing about the harm at issue; and (2) absent the act or omission ("but for" the act or omission), the harm would not have occurred. *Akin, Gump, Strauss, Hauer & Feld, L.L.P.*, 299 S.W.3d at 122; *Lee Lewis Const., Inc.*, 70 S.W.3d at 784. Proof of causation does not require the exclusion of all other possible causes, but rather requires a showing that the greater probability is that the act or omission in question caused the harm. *City of Gladewater v. Pike*, 727 S.W.2d 514, 518 (Tex. 1987); *Farley v. M M Cattle Co.*, 529 S.W.2d 751, 755-56 (Tex. 1975). A greater probability is shown when in the absence of other reasonable causal explanations it becomes more likely than not that the injury was a result of the act or omission in question. *Parker v. Employers Mut. Liability Ins. Co.*, 440 S.W.2d 43, 47 (Tex. 1969); *Bradley v. Rogers*, 879 S.W.2d 947, 954 (Tex. App.—Houston [14th Dist.] 1994, writ denied).

The question presented in this sufficiency challenge is whether the letter sent by HMC/Host on April 18 caused the hotel property sale not to close or whether Keystone's failure to meet the conditions of closing, i.e., delivery of an SNDA,[4] estoppel certificate, and waiver, caused the transaction not to close.

Ashkenazy's attorney, David Kriss, sent letters prior to the April 28th closing date insisting on compliance with all of the required deliveries. Kriss testified, however, that the SNDA could have been waived, and the previously delivered estoppel certificate would have been acceptable if the title company had insured around the Section 14.02 issue. Kriss informed Keystone's attorney that there was a difference between HMC/Host sitting back (suggesting the 90 day argument would work) and sending the letter stating Keystone was in default. Kriss testified that when he read the April 18 letter, he knew the deal was in trouble and that the letter would impact the closing. Kriss also testified he could not say whether the deal failed to close based on the letter or the lease provision. Kriss further testified that he was unsure if the letter materially impacted closing. He was sure it had an impact, but could not speak for the underwriter.

Ashkenazy did not recall seeing the April 18 letter, but agreed with Kriss on whether the deal would close if the title companies insured over the Section 14.02 issue.

Barry Brown with HFF testified that the April 18 letter was intended to either delay the deal or blow it up. When he saw the letter, he knew the deal was going south and that the title company would object. The letter was a major concern and a surprise given that the estoppel certificate had been signed and returned. Brown compared the letter to a bomb.

---

[4] SNDA is an acronym for subordination, attornment, and non-disturbance agreement in which a tenant agrees to subordinate its rights to the lender while the lender agrees not to terminate a lease upon foreclosure unless the lease is in default.

Gerdes testified that the April 18 letter was devastating and prevented the deal from closing.

Keystone's attorney, Laura Sims, acknowledged that the title company had listed a waiver as a requirement in its original title commitment and that Kriss's letters regarding the failure to close listed the failure to deliver all of the required documents. Sims described the April 18 letter as a "sucker punch" that ratcheted up the risk to the title company by making the risk "live" and making it more difficult to write around. The letter caused the issue to go from being potential to actual. Sims testified that the title company would have insured around the Section 14.02 issue but for the letter.

Jennifer Flynn Maxwell, the closing agent for Land America, testified that the waiver was always a requirement, and she did not believe the policy would issue without the waiver. Maxwell believed the April 18 letter changed things and was a substantial contributing factor in the title company's decisions. Maxwell testified that the discussions at Land America revolved around the April 18 letter.

Samuel Edward Smith, the commercial account manager for Fidelity, testified that Fidelity was looking for a waiver because the title commitment was issued listing it as a requirement on Schedule C. Smith also testified that the April 18 letter was a substantial contributing factor in Fidelity's decision not to insure; however, he later stated that Fidelity was going to have the issue regardless, and the waiver was needed both before and after the April 18 letter.

As previously noted, we must defer to the jury's role in judging the credibility of the witnesses and the weight of the testimony and determine whether the evidence at trial enabled reasonable and fair-minded people to find that the April 18 letter proximately caused the sale to

Ashkenazy not to close. *See City of Keller v. Wilson*, 168 S.W.3d at 827. Having reviewed the record as a whole, including the testimony summarized above, we hold that the evidence is sufficient to support the jury's causation finding.

ABSOLUTE JUDICIAL PRIVILEGE

HMC/Host next contends the April 18 letter was protected by an absolute judicial privilege. "Communications in the due course of a judicial proceeding will not serve as the basis of a civil action for libel or slander, regardless of the negligence or malice with which they are made." *James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982). "This privilege extends to any statement made by the judge, jurors, counsel, parties or witnesses, and attaches to all aspects of the proceedings, including statements made in open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case." *Id.* at 916-17.

In *Russell v. Clark*, 620 S.W.2d 865, 868 (Tex. App.—Dallas 1981, writ ref'd n.r.e.), the Dallas court noted, "Although Texas has not yet extended the doctrine of absolute privilege to out-of-court communications made by attorneys preliminary to a judicial proceeding, or in connection therewith, we think the doctrine should be so extended. Public policy demands that attorneys be granted the utmost freedom in their efforts to represent their clients." Persuaded by section 586 of the Restatement (Second) of Torts, which extended the privilege to attorneys with regard to communications preliminary to a proposed judicial proceeding, the Dallas court held that such a privilege should be adopted. *Id*. at 869-70. Following *Russell*, several courts, including this court, have extended the privilege to out-of-court communications by an attorney if the statement has some relationship to a contemplated proceeding. *See, e.g., Daystar Residential, Inc. v. Collmer*, 176 S.W.3d 24, 27-29 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (attorney's statements to newspaper in reference to proposed lawsuit); *Krishnan v. Law*

*Offices of Preston Henrichson, P.C.*, 83 S.W.3d 295, 302-03 (Tex. App.—Corpus Christi 2002, pet. denied) (letter from attorney to doctor alleging he committed negligence; *Bell v. Lee*, 49 S.W.3d 8, 10-12 (Tex. App.—San Antonio 2001, no pet.) (letter from attorney to police officer with copies to police department and city attorney threatening lawsuit for slanderous comments officer made to a bank).

Unlike other courts, this court has held, "the privilege attaches if the statement has some relationship to a contemplated proceeding, regardless of whether it in fact furthers the representation." *Bell*, 49 S.W.3d at 11; *see also Daystar Residential, Inc.*, 176 S.W.3d at 27-28 (requiring that the communication further the attorney's representation, but noting *Bell* holds to the contrary). This court has also recognized the following comments to section 586 of the Restatement (Second) of Torts:

> As to communications preliminary to a proposed judicial proceeding the rule stated in this Section applies only when the communication has some relation to a proceeding that is contemplated in good faith and under serious consideration. The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered.

*Bell*, 49 S.W.3d at 11 (quoting Restatement (Second) of Torts § 586 cmt. 3, at 248 (1977)); *see also DeLeon v. Eilers*, No. 04-96-00497-CV, 1997 WL 81650, at *2 (Tex. App.—San Antonio Feb. 26, 1997, no writ) (not designated for publication) (quoting last sentence of comment).

Whether an alleged defamatory communication is related to a proposed judicial proceeding is a question of law. *Daystar Residential, Inc.*, 176 S.W.3d at 28; *Bell*, 49 S.W.3d at 10. All doubt is resolved in favor of the communication's relation to the proceeding. *Daystar Residential, Inc.*, 176 S.W.3d at 28; *Bell*, 49 S.W.3d at 10-11.

Keystone argues that the letter sent by HMC/Host does not qualify for the absolute privilege because: (1) it was not sent by an attorney; and (2) it does not refer to litigation. With

regard to the first argument, HMC/Host cites cases in which the communication was not sent by an attorney. However, in *Bird v. W.C.W.*, 868 S.W.2d 767, 768 (Tex. 1994), the affidavit was a document submitted directly to the court in a judicial proceeding; therefore, it was not an out-of-court communication. Similarly, in *5-State Helicopters, Inc. v. Cox*, 146 S.W.3d 254, 258-59 (Tex. App.—Fort Worth 2004, pet. denied), the letter was submitted directly to the FAA in a quasi-judicial proceeding relating to an on-going investigation and, thus, was not an out-of-court communication. Because the extension of the privilege to out-of-court communications is based on the adoption of section 586 of the Restatement (Second) of Torts (which only pertains to communications by attorneys) and because the reason for the adoption of section 586 was a public policy rationale in favor of attorneys as officers of the court, we disagree that the privilege extends to out-of-court communications by non-attorneys.

Moreover, the letter in question is written by HMC/Host regarding alleged violations of the Lease as HMC/Host interpreted it. Although the letter demands that Keystone comply with the Lease by taking certain actions, the letter never refers to a judicial proceeding. In *Eilers*, 1997 WL 81650, at *1, this court considered whether the privilege extended to a letter written by an attorney to a chief of police. The attorney was retained by Julie Esparza, who claimed to be the common-law wife of Valentine DeLeon and with whom she had purchased a truck prior to his death. *Id.* The truck was being driven by a second woman also claiming to be the decedent's wife. *Id.* The company that loaned Esparza the money to purchase the truck told her she would not be relieved of liability under the purchase contract unless she reported the truck stolen. *Id.* Esparza hired an attorney who wrote a letter to the chief of police setting forth the facts and asserting the woman in possession of the truck did not have a valid claim to the truck and that the

truck should be reported as stolen. *Id*. This court held that the letter was not privileged because it did not "refer to a judicial proceeding." *Id*. at \*2.

In addition to not referring to a judicial proceeding, the letter in this case does not sufficiently suggest that a judicial proceeding is under consideration. Although the letter might be read to suggest that a judicial proceeding might be a possibility if the demands are not met, this bare possibility is not sufficient to satisfy the applicable standard. *See Bell*, 49 S.W.3d at 11; *Eilers*, 1997 WL 81650, at \*2.

JUSTIFICATION

HMC/Host further asserts that Keystone's tort claims fail as a matter of law because HMC/Host's actions were justified in the exercise of its contractual rights. Alternatively, HMC/Host contends it was exercising a colorable legal right in good faith as a matter of law.

The justification defense is based on either the exercise of: (1) one's own legal rights; or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken. *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex. 1996). If a trial court finds that a defendant had a legal right to interfere with a contract, then the defendant has conclusively established the justification defense. *Id*. If the defendant cannot establish such a legal right as a matter of law, the defendant may prevail on a justification defense if: (1) the trial court determines that the defendant interfered while exercising a colorable right; and (2) the jury finds that, although mistaken, the defendant exercised that colorable legal right in good faith. *Id*. Whether the communication is the exercise of a colorable right, therefore, is a question of law for the court. *Prudential Ins. Co. of America v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 80 (Tex. 2000). A right is colorable if it appears on its face to be genuine, truthful, valid, or existing. *Bennett v. Computer Assocs. Int'l, Inc.*, 932 S.W.2d 197, 202 (Tex. App.—Amarillo 1996, writ

denied). Good faith means having an objectively well-grounded and justifiable belief of a right. *Id*. at 203.

As previously discussed in analyzing the sufficiency of the evidence to support the jury's malice finding in relation to the slander of title claim, the Lease is unambiguous and does not require the exclusive negotiation period as asserted by HMC/Host in the April 18 letter. Accordingly, HMC/Host's letter was not an exercise of HMC/Host's legal rights because the rights asserted did not exist. As a result, justification was not established as a matter of law. We further question the trial court's submission of the justification defense to the jury because, as previously discussed, HMC/Host was not exercising a colorable right.

Even if we consider the sufficiency of the evidence supporting the jury's finding that HMC/Host was not acting in "good faith," a party attempting to overcome an adverse fact finding as a matter of law must surmount two hurdles. *Hartmann v. Solbrig*, 12 S.W.3d 587, 595-96 (Tex. App.—San Antonio 2000, pet. denied) (quoting *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 939 (Tex. 1991)). First, the record must be examined for evidence that supports the fact finder's finding, while ignoring evidence to the contrary. *Id*. Second, if there is no evidence to support the fact finder's answer, then, the entire record must be examined to see if the contrary proposition is established as a matter of law. *Id*.

In this case, the evidence was conflicting as to the intent of HMC and Host in sending the letter. The witnesses associated with HMC/Host testified that the letter was intended to protect its rights under the Lease. The witnesses associated with Keystone testified that the letter was a "sucker punch" sent in an effort to delay or blow up the deal. This later testimony is supported by Host's delay in asserting its position and waiting until either on or after the 90th day from the

date it received Keystone's notice to send the letter.[5] Furthermore, Burke's testimony that he had a problem with any allocation that was anything higher than HMC/Host's determination of the fair market value must be considered. Since we must first ignore evidence contrary to the jury's finding of no good faith, we must accept the jury's decision to believe the witnesses associated with Keystone. Based on their testimony, the jury could have believed that HMC/Host was not acting in "good faith."

**ATTORNEYS' FEES**

In its final issue, HMC/Host challenges the award of attorney's fees to Keystone asserting: (1) Keystone's tort claims did not arise out of or concern the Lease; and (2) Keystone was required to segregate its fees between claims for which such fees were recoverable (arose out of or concerned the Lease and on which Keystone prevailed) from fees that were not recoverable (did not arise out of or concern the Lease or on which Keystone did not prevail).

**A.      Arise Out of or Concern Lease**

Section 14.20 of the Lease authorizes the recovery of attorney's fees by the prevailing party in any legal action "arising out of or concerning the Lease or the rights of any party hereto." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (West 2008) (authorizing recovery of attorney's fees for contractual claims). Initially, we note that Keystone prevailed on HMC's claim that it breached the Lease. Moreover, Keystone's tort claims arose out of or concerned HMC/Host's allegation that the Lease provided it with certain rights. Although recovery was based on the finding that HMC/Host did not have the rights it alleged, the litigation arose out of its contention that such rights existed under the Lease. Accordingly, Keystone was entitled to recovery of attorney's fees for its tort claims.

---

[5] Evidence was presented that in a subsequent letter from Gerdes, he made a reference to January 18 being the start date for the 90-day period. Gerdes testified that the January 18 date was a typographical error and was intended to refer to the January 7th date of Keystone's notice letter to HMC.

**B.     Segregation**

"[I]f any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees."  *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006).  Because we hold that Keystone's tortious interference and slander of title claims arise out of or concern the Lease, Keystone was not required to segregate its fees because it did not assert a claim for which fees were unrecoverable.

<h3 align="center">PUNITIVE DAMAGES</h3>

In its cross-appeal, Keystone contends the trial court erred in granting HMC/Host's motion to disregard jury findings and for judgment notwithstanding the verdict as to the jury's malice finding.  Keystone also challenges the trial court's granting of HMC/Host's motion as to the jury's finding that HMC authorized or ratified Host's malice.

HMC/Host's motion asserted several grounds challenging the sufficiency of the evidence to support the jury's findings that: (1) HMC/Host was liable for slander of title; and (2) HMC/Host did not have a good faith belief that it had the right to send the April 18 letter which was the question pertaining to HMC/Host's justification defense.  Because we have previously rejected those sufficiency challenges on appeal, the trial court could not have properly granted HMC/Host's motion on those grounds.  HMC/Host's motion also asserted that: (1) the evidence was legally insufficient to support the jury's findings that the harm to Keystone resulted from malice and that HMC authorized or ratified Host's malice; and (2) the trial court improperly instructed the jury during its deliberations.  Keystone contends that because neither of those grounds would support the trial court's granting of HMC/Host's motion, the motion was improperly granted.

**A.    Legal Sufficiency – Malice Finding**

Question 16 asked the jury whether it found by clear and convincing evidence that the harm to Keystone found in Question 14 (the actual damages caused by the slander of title) resulted from malice.  The jury was instructed that "clear and convincing evidence" meant "the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established."  The jury also was instructed that "malice" meant "a specific intent by Host Marriott to cause substantial injury or harm to Keystone."  "Specific intent means that the actor desires to cause the consequences of his act, or he believes the consequences are substantially certain to result from it."  *In re Estate of Russell*, 311 S.W.3d 528, 535 (Tex. App.—El Paso 2009, no pet.); *see also Rodriguez v. Naylor Indus., Inc.*, 763 S.W.2d 411, 412 (Tex. 1998) (applying same definition to term intent).  "[T]he term 'substantial' has two basic components: real vs. merely perceived, and significant vs. trivial."  *Bennett v. Reynolds*, 315 S.W.3d 867, 872 (Tex. 2010).

To recover exemplary damages, Keystone had to present clear and convincing evidence that (as defined in the court's charge) Host Marriott's conduct when viewed objectively from the standpoint of Host Marriott at the time of its occurrence involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  *Qwest Int'l Commc'ns, Inc. v. AT&T Corp.*, 167 S.W.3d 324, 326 (Tex. 2005).  Because clear and convincing evidence was required, "we review all the evidence in the light most favorable to the jury's finding, taking into account contrary undisputed facts, to determine whether reasonable jurors could have formed a firm belief or conviction regarding malice."  *Id.*  Circumstantial evidence can be sufficient to prove malice.  *Nast v. State Farm Fire & Cas. Co.*, 82 S.W.3d 114, 125 (Tex. App.—San Antonio 2002, no pet.).

HMC/Host argues that the trial court properly disregarded the jury's malice finding because it was merely exercising its contractual rights. This argument is similar to its justification defense. HMC/Host argues there was "an honest difference of opinion as to the interpretation or legal effect of" the Lease, and "the sincere pursuance of a claimed legal right under [a] contract by one of the parties cannot form the basis of an award of punitive damages." *Exxon Corp. v. Bell*, 695 S.W.2d 788, 790-91 (Tex. App.—Texarkana 1985, no writ). Keystone counters that the contractual rights were clear, and the jury could imply malice because HMC/Host knew or should have known it did not have a contractual right to require the type of notice of the sale that it demanded. *First Interstate Bank of Ariz., N.A. v. Interfund Corp.*, 924 F.2d 588, 596 (5th Cir. 1991).

We initially note that in the case HMC/Host cites in support of its argument, the court held that the contract in question was ambiguous before addressing the malice finding. *Exxon Corp.*, 695 S.W.2d at 790. The court concluded that a term that was in dispute was reasonably susceptible to both parties' interpretation. *Id.* In this case, however, we previously held that the Lease is not ambiguous because it is not reasonably susceptible to more than one interpretation. Moreover, as indicated above in addressing the sufficiency points, the evidence regarding HMC/Host's intent was conflicting. Given the language of the Lease, the language of the April 18 letter, the timing of the April 18 letter, and the testimony, we hold the evidence was sufficient for the jury to have formed a firm belief or conviction that Host Marriott had a specific intent to cause substantial injury or harm to Keystone. Accordingly, the trial court would have erred in granting HMC/Host's motion on this basis.

**B.    Jury Communication**

Keystone also contends that the trial court could not have granted a judgment notwithstanding the verdict on the basis of improper communication with the jury.  The record establishes that when the bailiff initially brought the jury's verdict to the trial judge, the trial judge looked the verdict over and instructed the bailiff to take it back to the jury.  When the jury was being brought into the courtroom after it reached its verdict, the trial judge informed the attorneys that the jury had not answered a couple of the questions and that the trial judge had asked them to answer the questions.  HMC/Host argued that the returning of the verdict was improper under Rule 295 of the Texas Rules of Civil Procedure which provides that if the jury's verdict is incomplete, "the court shall in writing instruct the jury in open court of the nature of the incompleteness . . . , provide the jury such additional instructions as may be proper, and retire the jury for further deliberations."  TEX. R. CIV. P. 295.

Rule 301 of the Texas Rules of Civil Procedure permits a trial court to render a judgment notwithstanding the verdict "if a directed verdict would have been proper."  TEX. R. CIV. P. 301.  Furthermore, Rule 301 permits a trial court to "disregard any jury's finding on a question that has no support in the evidence."  *Id*.

On appeal, Keystone argues that HMC/Host's complaint about the trial judge returning the jury's verdict cannot be made in a motion to disregard.  HMC/Host responds that a judgment notwithstanding the verdict can be granted if a legal principle bars recovery.  One of the cases cited by HMC/Host to support its contention is *McIntyre v. Comm'n for Lawyer Discipline*, 247 S.W.3d 434 (Tex. App.—Dallas 2008, pet. denied).  In that case, the court does state, "A motion for jnov should be granted when (1) the evidence is conclusive and one party is entitled to recover as a matter of law or (2) a legal principle precludes recovery."  *Id*. at 441.  The court

prefaces this statement, however, by stating, "A jnov is proper when a directed verdict would have been proper." *Id*.; *see also Fort Bend Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991) ("A court may render a judgment n.o.v. if a directed verdict would have been proper."). Reading the statements in context, a judgment notwithstanding the verdict is proper if a directed verdict would have been proper because a legal principle bars recovery. *See AMS Const. Co. v. K.H.K. Scaffolding Houston, Inc.*, No. 01-09-00360-CV, 2011 WL 1598745, at 8 (Tex. App.—Houston [1st Dist.] Apr. 28, 2011, pet. abated); *see also Schindley v. Northeast Tex. Cmty. Coll.*, 13 S.W.3d 62, 65 (Tex. App.—Texarkana 2000, pet. denied) (noting judgment notwithstanding the verdict is appropriate when "as a matter of law, the claim or defense presented is not viable and should never have been presented to the jury").

HMC/Host's reliance on the propriety of a directed verdict on the issue of improper jury communication is erroneous for several reasons. First, a motion for directed verdict "is a procedural device to ask the court to render judgment without submitting the charge to the jury because there is nothing for the jury to decide." Michael O'Connor & Byron P. Davis, *O'Connor's Texas Rules – Civil Trials* 659 (2011). HMC/Host's complaint in this instance is not that the questions should not have been submitted to the jury. Rather, HMC/Host's complaint is that the trial judge's communication with the jury after the questions were submitted was improper. Moreover, the complaint raised by HMC/Host pertaining to improper jury communication would not "bar" recovery such that the trial court could render judgment on that basis. At most, improper jury communication could, if proven, entitle HMC/Host to a new trial. Accordingly, the trial court could not have properly granted a judgment notwithstanding the verdict and thereby rendered judgment in favor of HMC/Host on Keystone's punitive damages claim on the basis that the trial court improperly communicated with the jury.

**C.    Liability of HMC**

Keystone also argues that both Host and HMC should be held liable for the punitive damages.  Keystone contends the trial court improperly disregarded the jury's finding that HMC authorized or ratified the malice by Host.

A corporation is liable for punitive damages if it authorizes or ratifies an agent's malice. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998).  "In Texas for purposes of legal proceedings, subsidiary corporations and parent corporations are separate and distinct 'persons' as a matter of law."  *Valero South Tex. Processing Co. v. Starr County Appraisal Dist.*, 954 S.W.2d 863, 866 (Tex. App.—San Antonio 1997, pet. denied).  Accordingly, a subsidiary corporation could be an agent of its parent if the evidence supported such a finding.

The jury charge defined the term agent as "one who acts with the party's authority or apparent authority."  The jury was further instructed that the principal must agree that the agent act on its behalf and for its benefit, and if the agent is authorized, the agent may do whatever is proper, usual, and necessary to perform the act expressly authorized.  Finally, the jury was instructed that apparent authority exists if a party: (1) knowingly permits another to hold himself out as having authority; or (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment.  Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists.

Daniel Burke testified that HMC is a wholly owned subsidiary of Host.  HMC is the tenant under the ground lease; however, the April 18 letter was sent by Host.  Burke testified that Host was making decisions for itself and for HMC regarding the transaction.  Burke testified that Host was acting as an agent for HMC.  Accordingly, this testimony was sufficient evidence to

support the jury's finding that Host was acting as HMC's agent and authorized or ratified Host's malice.

**D.     Conclusion**

The record provided no proper basis for the trial court to grant HMC/Host's motion for judgment notwithstanding the verdict.

## CONCLUSION

The portion of the trial court's judgment granting HMC/Host's Motion to Disregard Jury Findings and for Judgment Notwithstanding the Verdict as to Question Nos. 16 and 17 is reversed, and judgment is rendered that Keystone shall have and recover $5,000,000 in punitive damages against Host Marriot and $2,500,000 in punitive damages against HMC. The remainder of the trial court's judgment is affirmed.

Catherine Stone, Chief Justice